In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 06-1027

BELINDA DUPUY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

BRYAN SAMUELS, Director, Illinois
    Department of Children and
    Family Services,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 4199—**Rebecca R. Pallmeyer**, *Judge*.

_____

ARGUED SEPTEMBER 20, 2006—DECIDED OCTOBER 3, 2006

_____

Before POSNER, EASTERBROOK, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*.  This class action suit by parents, now in its tenth year, challenges a range of practices by Illinois' child-welfare agency claimed to infringe parental rights that are protected by the due process clause of the Fourteenth Amendment; for background, see *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005). The present appeal is from a preliminary injunction that the plaintiffs, who are the appellants, contend does not go far enough; the defendant has not cross-appealed. The plaintiffs are also attempting to

appeal from the judge's class certification order, which they contend defined the plaintiff class too narrowly. But their time to appeal from that order has long expired. Fed. R. Civ. P. 23(f).

The injunction of which the plaintiffs complain violates Rule 65(d) of the civil rules, which requires that an injunction be a self-contained document rather than incorporate by reference materials in other documents. The purpose is to minimize disputes over what has been enjoined. *Schmidt v. Lessard*, 414 U.S. 473 (1974) (per curiam); *International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 74-76 (1967); *D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 461 (7th Cir. 1993); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2955 (2d ed. 1995); 13 *Moore's Federal Practice* § 65.60, pp. 475-77 (13th ed. 2006). The Ninth Circuit allows incorporation by reference if the material thus incorporated is physically attached, as by stapling, to the injunction order. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1132-33 (9th Cir. 2006); *California v. Campbell*, 138 F.3d 772, 783 (9th Cir. 1998). But there is no reason to complicate the administration of the rule by such an interpretation. There are times when literal interpretation is best; this is one of them. The Ninth Circuit's approach would encourage just the kind of mistake that the rule aims to prevent—the thoughtless attachment of separately composed documents when if the judge had integrated their contents into the injunction order he might have realized that they would not cohere with the rest of the order without changes.

Rule 65(d) is simple, clear, sensible, easily complied with and not even new; we are distressed by the failure of the parties and the district judge to have complied with it in this case—a case that underscores the good sense of the

rule. What the parties and the district judge understand to be the injunction begins with an opinion by the judge in which she says that "the court approves the DCFS proposal, with certain modifications, outlined below," and the "outline" follows. If the "certain modifications" were literally an "outline," there would be no injunction but merely the sketch of one. But it is apparent that the word "outlined" was used imprecisely; and likewise that when the court, as one of its modifications, said vaguely that "the court *would* add a statement to this effect . . ." (emphasis added), it meant that the language that followed was part of the injunction. Yet one of the "modifications" modifies nothing; it says merely that "the court *recommends* that the plan provide" etc.—and a recommendation cannot be an injunction.

Both sides are complicit in the violation of Rule 65(d), having expressed no concern with the form of the injunction. But the appellants in addition violated 7th Cir. R. 30(d), which requires certification that the appendix contain all materials required by Rule 30(a) to be included in the appendix. For among the required materials are the judgment, and the judgment in this case includes not only the judge's order modifying the defendant's proposed injunction, *Chicago & North Western Transportation Co. v. Railway Labor Executives' Ass'n*, 908 F.2d 144, 149-50 (7th Cir. 1990), but also those portions of that proposed injunction that the judge (improperly) incorporated by reference. They do not appear in the appellants' appendix but instead are deeply buried in the record; the lawyers could not find them when asked for them at argument.

So Rule 65(d) was flouted. But a violation of the rule does not deprive the appellate court of jurisdiction to review the injunction (e.g., *Combs v. Ryan's Coal Co.*, 785 F.2d 970, 978 (11th Cir. 1986)) unless as a result of the violation it is so

unclear what the defendant is enjoined from doing that he could not be punished for violating the injunction. For in that event he would lack standing to challenge the injunction because, being unenforceable, it would place no burden on him. He could thumb his nose at it with impunity. *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, 299 F.3d 643, 646-47 (7th Cir. 2002); *Chicago & North Western Transportation Co. v. Railway Labor Executives' Ass'n*, *supra*, 908 F.2d at 149-50; see also *Bates v. Johnson*, 901 F.2d 1424, 1428 (7th Cir. 1990). "[A]n unenforceable order is no order at all." *Marseilles Hydro Power, LLC v. Marseilles Land & Water Co.*, *supra*, 299 F.3d at 647.

The power to review an injunction that violates Rule 65(d) extends to any adequately clear materials clearly incorporated into the injunction by reference. *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, 970 F.2d 273, 275-76 (7th Cir. 1992); cf. *Abbott Laboratories v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1241-42 (11th Cir. 2000). And that is this case. The core of the injunction is clear enough to be enforceable; it requires the defendant to provide informal administrative review of "safety plans."

But there is tension between *Original Great American Chocolate Chip Cookie Co. v. River Valley Cookies, Ltd.*, *supra*, and *D. Patrick, Inc. v. Ford Motor Co.*, *supra*, which states that an injunction that incorporates materials by reference cannot be enforced, though the court went on to find that in any event the incorporated material—a settlement agreement—was ambiguous. 8 F.3d at 461-62. *D. Patrick* did not cite *Great American*, and its flat statement of unenforceability, which is not limited to incorporation by reference but embraces any injunction that violates Rule 65(d), is inconsistent with the decisions holding that a violation of the rule does not affect the jurisdiction of the reviewing

court as long as the obligations that the injunction imposes on the defendant are clear enough that he can be punished should he violate them.

*D. Patrick* justified its unorthodox position by quoting from *H.K. Porter Co. v. National Friction Products Corp.*, 568 F.2d 24, 27 (7th Cir. 1977), that "Rule 65(d) is no mere extract from a manual of procedural practice. It is a page from the book of liberty." 8 F.3d at 461. Beware decision by metaphor. What the court seems to have meant was that it would be unjust to punish someone for violating an injunction that he could not understand. It would be. But Rule 65(d) is not needed to ward off that injustice; if the injunction is unclear, the defendant cannot be punished for violating it, Rule 65(d) or no Rule 65(d). The purpose of the rule is to make sure that violations of injunctions *are* punishable.

The lofty language of *H.K. Porter* is particularly inapt when as in this case it is the plaintiff that is appealing the injunction. For it is then much as if the plaintiff were appealing from the denial of injunctive relief altogether, which would present no problem under Rule 65(d). The difference is that when there *is* an injunction and the plaintiff is seeking additional relief, the need for that relief is likely to depend on what relief the judge has already granted, and to be able to form a precise and concise understanding of that relief may require that the rule have been complied with.

Enough said about the procedural issue. Let us turn to the merits, and explain what a "safety plan" is.

If the State of Illinois "(1) has reason to believe that the child cannot be cared for at home or in the custody of the person responsible for the child's welfare without endangering the child's health or safety; and (2) there is not time to

apply for a court order . . . for temporary custody of the child," the state can take the child into "temporary protective custody" without additional process, 325 ILCS 5/5, but there is a right to a judicial hearing within 48 hours. 705 ILCS 405/1-3, -5, 405/2-9(1), (3); *In re John Paul J.*, 799 N.E. 2d 769, 776 (Ill. App. 2003). Other states have similar laws, though often they require "reasonable cause" or "probable cause" rather than "reason to believe," Alyson Oswald, Comment, "They Took My Child! An Examination of the Circuit Split Over Emergency Removal of Children From Parental Custody," 53 *Cath. U. L. Rev.* 1161, 1183 n. 131 (2004), although it is doubtful whether there is any practical difference among these formulas, any one of which should satisfy the due process clause of the Fourteenth Amendment. See, e.g., *Berman v. Young*, 291 F.3d 976, 983-84 (7th Cir. 2002); *Brokaw v. Mercer County*, 235 F.3d 1000, 1010-11 (7th Cir. 2000); *Doe v. Kearney*, 329 F.3d 1286, 1294-95 (11th Cir. 2003); *Croft v. Westmoreland County Children & Youth Services*, 103 F.3d 1123, 1126-27 (3d Cir. 1997). Among the liberties protected by that clause is the right of parents to the custody of their children. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion). But "when a child's safety is threatened, that is justification enough for action first and hearing afterward." *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir. 1983); see also *Duchesne v. Sugarman*, 566 F.2d 817, 825-26 (2d Cir. 1977).

But sometimes, in lieu of immediately removing the child from its parents, the state will offer the parents the option of agreeing to a "safety plan," under which restrictions short of removal are imposed pending completion of the state's investigation into abuse or neglect. The plan might require that one of the parents leave the house where the child is living, or that the parent keep out of the child's presence

unless a designated family member is present as well, or that the child be sent to live with other family members. Although these curtailments of parental rights are less extreme than removing the child from parental custody altogether and sticking him in foster care, they may be invasive enough to count as deprivations of liberty, thus triggering the right to a hearing. The difference from the standpoint of parental rights between removing the parent from the child's home and removing the child from the home is not negligible, because in the first case the child remains in his accustomed residence and often with one of his parents. But it is not great enough to justify concluding that there is no invasion of parental liberty in the first case, *Croft v. Westmoreland County Children & Youth Services*, *supra*, 103 F.3d at 1125-27, although the amount of process that is constitutionally required may be less since the deprivation is less. See *Gottlieb v. County of Orange*, 84 F.3d 511, 522 (2d Cir. 1996).

Critically, however, the decision to agree to a safety plan is optional with the parents. If they think that if they turn down the plan the state will not try to remove the child from their custody, or that if it does they will prevail in the prompt judicial hearing to which they are entitled on the propriety of the removal, they will reject the plan. The plan is thus a form of interim settlement agreement pending the outcome of the investigation, as when a plaintiff in a suit for restitution agrees not to move for immediate seizure of assets held by the defendant if the latter agrees to place them in judicial custody. It is not surprising that the safety-plan program is not embodied in a statute or formal regulation, but merely in internal directives of the Department of Children and Family Services. It imposes no obligation on anybody.

Which answers the plaintiffs' argument that the Constitution entitles parents to a hearing before they are offered the option of agreeing to such a plan. There is no right to a hearing when no substantive right has been infringed or is threatened with being infringed. The state does not force a safety plan on the parents; it merely offers it. Parents are entitled to a hearing if their parental rights are impaired, and the offer of a settlement no more impairs those rights than a prosecutor's offer to accept a guilty plea impairs the defendant's right to trial by jury.

It is true that by refusing to agree to a safety plan, as by refusing to plead guilty, a person may find himself in a worse pickle than if he had accepted it. The plan might be for the child's father to move out of the house for a week. If he refused, the state might decide to place the child in foster care, and though if it did so he could demand a judicial hearing, the judge's ruling might go against him. That is a dilemma implicit in any settlement process. If there weren't a downside to refusing to settle, there would be no settlements.

Of course should the state violate the terms of the safety plan and by doing so curtail parental rights beyond what the parents had agreed to, they would be entitled by the Constitution to a prompt hearing. But that is not the complaint.

The plaintiffs are very wroth because, they say, the state sometimes offers a safety plan on the basis of "mere suspicion" of child abuse or neglect, rather than probable cause or at least reasonable suspicion. But as mere suspicion—some inarticulable hunch—is not a statutory ground for actually removing a child from his parents' custody (Illinois law requires, as we know, that the state have reason to believe that the child is in imminent danger), the parents

in such a case have only to thumb their nose at the offer and the agency can do nothing but continue its investigation, which it would do anyway. The plaintiffs complain that the prospect of a hearing if the state removes a child is not adequate because the hearing will not address the details of the safety plan; it will deal exclusively with the validity of the child's removal from the home and therefore, the plaintiffs insist, is inadequate. The argument is silly; a plaintiff might as well say that a tort suit can't be settled without a hearing on the validity of the settlement that the parties have reached. Because the safety plan is voluntary, no hearing of any kind is necessary; hearings are required for deprivations taken over objection, not for steps authorized by consent.

It adds nothing to say as the plaintiffs do that they did not *really* consent—that the state "coerces" agreement to safety plans by threatening to remove the child from the parents' custody unless they agree to the plan. It is not a forbidden means of "coercing" a settlement to threaten merely to enforce one's legal rights. If you sue and before judgment settle because the defendant is willing to settle on more favorable terms than you expect to obtain from pressing the suit to judgment, you've obtained a favorable settlement on the basis of an implicit threat to litigate to an outcome that would make the defendant worse off than if he settled; but you have not infringed any right of his. Coercion is objectionable—and when objectionable is more aptly described as duress or extortion—only when illegal means are used to obtain a benefit.

There is no evidence of that. The consent form that the state gives parents requires them if they consent to state in writing that they "understand that failure to agree to the [safety] plan or to carry out the plan may result in a reas-

sessment of my home and possible protective custody and/or referral to the State's Attorney's Office for a court order to remove my children from my home." This just notifies the parents of the lawful measures that may ensue from their failure to agree to a plan or, if they agreed to it, from their violating the plan. There is no suggestion that the agency offers a safety plan when it has no suspicion at all of neglect or abuse, and even in that case the ordinary prerequisite to a finding of duress—that the person have no effective legal remedy against the threat, *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 390 (7th Cir. 2002); *Oxxford Clothes XX, Inc. v. Expeditors Int'l, Inc.*, 127 F.3d 574, 579 (7th Cir. 1997); *Abbadessa v. Moore Business Forms, Inc.*, 987 F.2d 18, 22-23 (1st Cir. 1993)—would be missing, since if a child is actually taken, the parents have a very prompt legal remedy. If the agency has even just a bare suspicion, this may ripen in the course of the investigation into cause to obtain a court order of removal, and that possibility is all that the consent form should and does warn the parents of.

We can't see how parents are made worse off by being given the option of accepting the offer of a safety plan. It is rare to be disadvantaged by having more rather than fewer options. If you tell a guest that you will mix him either a martini or a manhattan, how is he worse off than if you tell him you'll mix him a martini? And yet the belief that giving people more options makes them worse off is common, especially in cases involving guilty pleas, as in our recent case of *United States v. Spilmon*, 454 F.3d 657 (7th Cir. 2006). The defendant agreed to plead guilty and receive a 57-month sentence. As part of the plea agreement the government dismissed charges against his wife. The defendant moved to set aside the guilty plea on the ground that he had been coerced to plead guilty by the realization that

otherwise his wife would be prosecuted. We affirmed the denial of the motion. We said "it would be in no one's interest if a defendant could not negotiate for leniency for another person. From the defendant's standpoint the purpose of pleading guilty is precisely to obtain a more lenient outcome than he could expect if he went to trial." *Id*. at 658. In words equally applicable to this case, we added that "suppose Spilmon were innocent, and *knowing this* but wanting to convict him the government told him that unless he pleaded guilty it would prosecute his wife—whom it also knew to be innocent. The couple could of course reject the package deal, hoping to be acquitted (being by hypothesis innocent), but given the inherent uncertainties of the trial process they might be afraid to do so, and the result would be a plea of guilty that resulted in the conviction of an innocent person (the husband). That would be a case of duress—that is, of pressure exerted to obtain a result to which the party applying the pressure had no right—and likewise if the government threatened to prosecute the defendant's wife knowing that she was innocent. But it is not duress to offer someone a benefit you have every right to refuse to confer, in exchange for suitable consideration." *Id*. at 658-59 (emphasis added; citations omitted). To the same effect, see *United States v. Miller*, 450 F.3d 270, 272-73 (7th Cir. 2006).

The fact that the safety-plan option is a boon to parents may explain why, though similar options are offered by other states, see, e.g., *In re T.A.*, 631 S.E.2d 399, 400 (Ga. App. 2006); *In re M.G.T.-B*, 629 S.E.2d 916, 917-19 (N.C. App. 2006), lawsuits challenging them have been rare—indeed this is the first we've found. A safety plan seems a sensible, perhaps indeed an unavoidable, partial solution to the agonizingly difficult problem of balancing the right of

parents to the custody and control of their children with the children's right to be protected against abuse and neglect.

The plaintiffs point us to *Doe v. Heck*, 327 F.3d 492, 524-25 (7th Cir. 2003), which held, so far as bears on this case, that a state agency violated the Constitution by threatening parents with removing their child from their custody if they did not have their attorney call the agency within 24 hours. It was a threat the agency had no right to make. The agency did not suspect the parents of child abuse. The child had been spanked at school, and the agency was investigating the school and wanted to interview the child and the parents were not cooperating. The agency had a right to interview the child, but there are procedures for compelling such an interview, and threatening the parents with the loss of their parental rights was not among the authorized procedures. The case nicely illustrates the line between a lawful threat and duress.

*Croft v. Westmoreland County Children & Youth Services*, *supra*, another case on which the plaintiffs place heavy weight, is closer to the present case, but still distinguishable. The defendant's caseworker, suspecting that a father was abusing his child but having no objective basis for the suspicion, gave the father an "ultimatum" that if he didn't leave the family home immediately the agency would place the child in foster care. The court held the threat improper on the ground that the caseworker did not have adequate grounds for removing the child from the parents' custody even temporarily. The threat was not grounded in proper legal authority. The coercion about which the plaintiffs complain in this case does not include such ultimata; the consent form informs the parents of the *possibility* that the child will be removed—information that is in the nature of a truism.

The trial on the merits of the plaintiffs' challenge to the administration of the safety plans is scheduled to begin on October 16. Maybe they'll be able to prove that the state really does coerce agreement to its safety plans wrongfully by misrepresentations or other improper means. They have not done so yet. On the record compiled so far, the plaintiffs are entitled to no relief at all. It is only the state's decision not to file a cross-appeal that prevents us from reversing the grant of the preliminary injunction, and that instead requires that the injunction be

AFFIRMED.

A true Copy:

      Teste:

                                _____

                                *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*